GRAND LODGE OF THE STATE OF NEW JERSEY, ORDER SONS OF ITALY IN AMERICA, complainant-respondent,

*v.*

SONS OF ITALY ASSOCIATION OF CAMDEN, NEW JERSEY, et al., defendants-appellants.

[Submitted May 29th, 1931.   Decided February 1st, 1932.]

On appeal from a decree and an order of the court of chancery advised by Vice-Chancellor Leaming, who delivered the following opinion:

"The bill herein is presented to this court by the grand lodge of this state, of a secret beneficiary organization, and seeks relief, for the benefit of the beneficial order, against a certain transfer of real and personal property which has been made by a subordinate lodge of the order to an incorporated body which is in no way affiliated with the order. The property which was so transferred embraced certain real estate, the legal title to which stood in the name of the subordinate lodge, on which land there had been erected a building containing stores and the lodge rooms in which the subordinate lodge held its meetings, and also included all of the furniture and cash and supplies of the subordinate lodge.

"About three months after the conveyance had been made the members of the subordinate lodge, except a small minority

who have remained loyal to the order, seceded—as they phrase it—and became members of the new body to whom the conveyance had been made, and in that manner the majority of the members of the subordinate lodge have gone over to the new corporation and have taken with them all the property of the subordinate lodge; thus leaving the subordinate lodge with its comparatively few remaining members without property or lodge home.

"The fraternal order now seeking relief is organized along the general lines of such bodies, with a supreme national lodge, a grand lodge in each of the several states and subordinate local lodges chartered by the grand lodge; all organized and operating for the single purpose of advancing the beneficial aims of the order.

"In this case I think it unnecessary to specifically consider the extent to which the three component organizations of the order may be said to be interwoven and interdependent and their respective spheres of operations to determine whether the grand lodge, complainant herein, enjoys the right to control the acts of a subordinate lodge in any attempt of such subordinate lodge to dispose of its accumulated assets, since the evidence in this case fully discloses that the subordinate lodge, which still exists and functions, did not at any time adequately authorize the transfer which was made by its officers.

"The bill seeks a return of these assets to the grand lodge to be administered by it, for the benefit of the order. The answer of the subordinate lodge admits the averments of the bill, but by counter-claim seeks the return of the assets to it, and the solicitor of complainant stipulates that the grand lodge is content with the latter course.

"The facts relating to the transfer here in question I find to be as follows:

"The subordinate lodge, already referred to, is by name 'Loggia Dante Alighieri No. 494, Order Sons of Italy in America,' and is hereinafter referred to as Dante Lodge, or Lodge, for convenience.

"Early in 1927 it was thought by some of the members of

Dante Lodge that something should be done to improve the financial condition of the lodge, and a committee was appointed to devise a plan. That committee reported its plan to the lodge at its meeting of February 6th, 1927. The report is recorded at length on the lodge minutes of that date, and a motion was then adopted to the effect that the committee should have full power to safeguard the lodge rights and do whatever should be necessary for putting into effect the project of Mr. Guaglianone, who reported the plan. At that time the lodge owned the lot at a corner of Fourth and Spruce streets, Camden, on which was erected a building containing the lodge rooms in which meetings were held and stores for rent. There is no testimony touching what either the real estate or the furniture in it may have then been worth. In the annual financial statement of the lodge, as of June 30th, 1926, the real estate is valued at $45,000 and its furniture at $10,000. The building was encumbered with a mortgage of $12,000. A lesser valuation, which also has not been supported by testimony, will be referred to later. The financial statement of June, 1926, disclosed assets in excess of all liabilities amounting to $37,245. This did not include the withdrawal value of fifteen shares of unemcumbered stock in building and loan associations. In 1927 the lodge may have owed something more than in 1926—the difference does not fully appear. In 1927, in addition to the mortgage, it owed a note of $3,000 and about $4,000 to members who had loaned money to the lodge on lodge bonds. There was also owing to the grand lodge for assessments for the mortuary fund some $1,100. The Guaglianone plan was, in general, to sell bonds to the members sufficient to pay all debts, and make the bonds a lien on the real estate. The plan, as reported, specifically provided that bonds should be acquired only by members of Dante Lodge, and should not be transferable to any persons other than members of Dante Lodge. The hope was entertained that in time the members might surrender their bonds.

"On February 15th, 1927, a printed postal card notice (*Exhibit C18*) was sent to members calling a meeting for

February 17th, 1927. This card gave notice that the meeting was 'for discussion and taking vote definitely upon the motion to make our home building an autonomous entity, with authorization to issue bonds exclusively for the brothers.' This notice was sent out to members by some one over the printed signature of the recording secretary without his knowledge or authority; but that may be here deemed immaterial.

"The minutes of the meeting of February 17th, 1927, are explicit and important and should be here quoted in full:

" 'The Venerable explains to the brothers who were not present at meeting of Feb. 6, Guaglianone's project, that is to convert in bonds the debts that are on our building, adding that in doing so we will render justice to our brothers who loaned or contributed and thus save our situation owing to too much annual interest that burdened the lodge.

" 'The Venerable concluded inviting all present to give their ideas on this subject, but none of the brothers took the floor on the subject. Then Brother Durso proposed that the same be put to a vote. Put to a vote by the Venerable, the result was approved unanimously, without any objections. Then the Venerable declared as a law, the Guaglianone's project.

" 'Brother Guaglianone demands the floor, saying that if we want to get rid of these debts that is the only way, hoping that every brother will do their duty has been verified.

" 'The Venerable asked the assembly to nominate five persons to formulate the corporation. Brothers Oberdan, Guerino seconded by Fiorindo Di Ludovico proposed that the five brothers be selected amongst the committee already existing.'

"The force of the proceedings at the meeting cannot be doubted. The plan adopted is there twice specifically stated as the 'Guaglianone's project.' That project, as already stated, is specifically set forth in detail in the minutes of February 6th, 1927. That plan, as stated, embraces a provision that the bonds shall be issued to members only and be non-negotiable except to members. No reference is made in Guaglianone's plan, as reported by him, to a transfer of the title of the property to a holding corporation, although that method of procedure may have been a part of his plan. Certain it is that the idea of selling the property to an alien organization in no way affiliated with Dante Lodge formed no

part of his project. The provision for bonds to members only was wholly inconsistent with any such purpose. And equally certain is it that no member familiar with the project as specifically reported could have doubted that the plan contemplated—as stated in the minutes of February 6th—'safeguarding the rights of Dante Lodge.' In general the scope and the whole scope and purpose of the plan was, as stated in the minutes of February 17th, 'to convert in bonds the debts that are on our building.' The first mention of effecting the plan through the formation of a corporation appears at the end of the minutes. If the members then understood that the Guaglianone project was to be carried out through the medium of a corporation to be formed for the purpose, clearly that notion carried with it the idea of safeguarding the rights of Dante Lodge in the property, including the issuance of bonds to members only. Obviously any corporation formed by the committee to effectuate the plan was charged with a trust to do so, and could not enjoy the status of an independent owner hostile to the plan and the interests of Dante Lodge. Nothing that transpired in that or any other meeting of the lodge or any notice to members embodies or suggests the idea that any corporation formed by the committee should in any event be more than a holding corporation for Dante Lodge.

"Shortly after the meeting of February 17th the grand council of the state heard something of the proposed plans of Dante Lodge and by reason of their objections were visited by certain members of the Guaglianone committee. The grand master has testified that at that meeting a member of the visiting committee stated that their proposed sale of the property was not a sale, but a transfer from Dante Lodge to a holding company, and that he as grand master forbade even that without consent from the grand lodge being first obtained. While I think that part of the conversation was denied by some of the committee, it is yet clear that up to that time no notion of a transfer of title had come before Dante Lodge unassociated with the idea that it was to carry out the Guaglianone project, under which it is clear that any

corporation formed by the committee to take the title would take the title as a mere medium to carry out the plan in the interests of Dante Lodge.

"The next meeting of the lodge was March 5th, 1927. This appears to have been a regular meeting, with no notice to members appraising them of any proposed action touching the disposal of the property. At that meeting it was reported by the venerable (presiding officer) that the work of the committee in regard to the house had been delayed by objections of the grand council, but that those objections had been adjusted, 'and the committee will continue its work to effect the sale.' The minute also discloses that one member pointed out the danger that 'the day will come when our house will land in the hands of one person,' 'but the venerable made him understand that this will never happen.' Clearly this explanation of the venerable negatives the idea that the property was to be sold to an alien body or antagonistic interests or in any way conveyed other than to effectuate the consummation of the Guaglianone project. The committee was then authorized to select an appraiser of the house and to have 'the proper persons to sign the deed.' I think it also clear that this suggestion of an appraisal and a deed cannot be properly regarded as an intent upon the part of the members present to depart from the essential features and inherent quality of the Guaglianone plan, or as more than an assent to such measures as the committee deemed necessary to effectuate that plan.

"The next meeting was March 17th, 1927. The minutes of that meeting relating to this matter are as follows:

" 'The Venerable brings before the Assembly the fact that the appraisal of the house has been done and same has been transferred to the new organization that has been selected from general committee, on the Guaglianone project, and that as soon as possible precise information will be given.'

"The matter of the transfer of assets does not appear to have again come before the lodge.

"It should be noted that defendant, Sons of Italy Association—a name closely resembling the old order, which is

Sons of Italy in America—was incorporated February 26th, 1927; nine days after the Guaglianone plan had been submitted. The expenses of its incorporation appear to have been paid by Dante Lodge; this is questioned but I think unsuccessfully. It is entirely clear that its incorporation was not only by the committee appointed by Dante Lodge and its incorporators members of that committee, but its purpose was that of carrying out the Guaglianone plan.

"The deed from Dante Lodge to defendant, Sons of Italy Association, was executed March 15th, 1927. It is in form an absolute conveyance in fee of the real estate of Dante Lodge. It is now claimed by defendant, Sons of Italy Association, that it is an innocent purchaser for value and that it holds its title free from any trust in favor of Dante Lodge. Its claim is that on March 14th, 1927, the Guaglianone committee appointed two competent real estate appraisers to appraise the value of the real estate; that on that day these appraisers found its value to be $24,000. On the following day the deed was executed and its consideration is claimed to be debts of Dante Lodge which were to be paid by the purchasing corporation as follows:

| | |
|---|---:|
| Mortgage on real estate .... ............... | $12,000.00 |
| Note of Victory Trust Co. .................. | 2,750.00 |
| Obligations of Dante Lodge to its brothers for loans and donations ..................... | 9,963.07 |
| Outstanding bills of House Committee of Dante Lodge ............................ | 885.89 |
| Total Debts ....................... | $25,598.96 |
| Price of property as fixed by experts ......... | $24,000.00 |
| Furniture (not appraised) ................ | 1,500.00 |
| Money of Dante Lodge in bank ............ | 253.00 |
| | $25,753.06 |
| Total Credits ............................... | $25,753.06 |
| Balance due Dante Lodge ........................... | $154.10 |

"It will be observed that defendant corporation took over not only the real estate at the appraised value of $24,000,

but also the furniture at a valuation of $1,500, and also the money of Dante Lodge in bank and supplies in the hands of the house committee of Dante Lodge and thus deemed itself debtor of Dante Lodge of $154.10. In other words, it took the entire assets of Dante Lodge except the building and loan association shares, which it unsuccessfully tried to withdraw, and was to pay its debts as the consideration of the purchase. The deed of conveyance of the real estate contains no clause of assumption of any of these debts; not even an assumption of payment of the mortgage on the real estate. No scrap of paper exists, so far as has been brought to my attention, in which defendant agrees to pay or in any way obligates itself to pay any of these debts of Dante Lodge, although it appears that it has since made some payments.

"As already stated no testimony of witnesses was introduced touching the value of these assets. In the annual financial statement of Dante Lodge of the preceding year the real estate is listed at $45,000 and the furniture at $10,000. The appraisement of the real estate made by the two men appointed by the committee was $24,000. No appraisement was made of the furniture. The total valuation of $25,500, for the real estate and furniture, at which valuation the transfer was made, strongly indicates a total valuation conveniently adopted to approximately equalize assets and liabilities. All this was consistent with the original Guaglianone plan if it was merely the creation of a holding company as a convenient medium to carry out that plan by the issuance of non-negotiable bonds to the members of Dante Lodge; and it cannot be too strongly emphasized that nothing appears upon the minutes of the lodge or in any notice to members of the lodge in any way suggesting that the proceedings of the Guaglianone committee of the lodge, which had been appointed to carry out that plan, which were to be taken or which were being authorized were other than in consummation of that plan in its essential features—a plan designed to refinance Dante Lodge through non-negotiable bonds sold to members of the lodge; whereas the plan executed by the committee turned over to an alien body with which Dante

Lodge had no affiliation and over which it had no control, all of the assets of Dante Lodge, with no right of redemption—not even reserving a meeting place or lodge furniture—in consideration of a mere promise to pay its debts, and that promise nowhere evidenced by writing. It seems impossible to find in the executed plan even a trace of the spirit and purpose of the original plan as spread at length and in great detail on the minutes of the lodge of February 6th, 1927. Clearly the membership at large were entitled to some notice of a purpose to make this radical change in the plan for the execution of which the committee was appointed. The suggestion is made that references were made in meetings of Dante Lodge to changes in the plans of the committee which do not appear upon the minutes of the lodge. The conception of the executed plan as a change of the original plan seems impossible; it retains no element of the original plan to aid Dante Lodge by a bond issue. In its practical effect the plan adopted amounted to a potential dissolution of Dante Lodge, since it left to that lodge scarcely more than a name.

"That obvious result soon followed the transfer. The members of Dante Lodge, save the few remaining loyal, soon severed their membership and became members of the new corporation, which had organized itself into a lodge form with the inviting name of Sons of Italy Association, closely resembling the name of the old order, but free and independent from any grand or supreme lodge control. There was nothing else for them to do. There was left to Dante Lodge not even a meeting place or furniture, and even the regalia of Dante Lodge is still in the possession of the new defendant body. But the loyal members of Dante Lodge retained their allegiance to the order and had the grand lodge install new officers, and Dante Lodge still exists and functions.

"I am fully convinced that in the circumstances stated the transfer of the assets of Dante Lodge cannot stand or be equitably recognized as a sale. It was not a sale.

"It could not have been properly understood by the membership of Dante Lodge as a sale, and I am unable to believe

that it was so understood by the membership at the time. In the circumstances then existing it was appropriately understood, and I believe was understood, by the membership, as a mere transfer in aid of the Guaglianone plan, as a transfer for the benefit of Dante Lodge and not in any sense as a severance of the beneficial interest of Dante Lodge in the property. The conception that the membership then realized or were given occasion to realize or understand that they were parting with all rights in their home and meeting place and all other lodge assets seems impossible in view of the facts disclosed by the evidence. And it must not be overlooked that the corporation to whom the transfer was made was a corporation formed by the Guaglianone committee, and composed of that committee's own members, for the purpose of carrying out the Guaglianone plan; a corporation without capital and, so far as appears, at that time without organization. A sale necessarily embodies the idea of a bargain as to price; in this case the committee representing Dante Lodge in the matter caused the transfer to be made to the corporation formed by them and composed of their own members; in practical effect to themselves. The inevitable conclusion appears to be that in the circumstances stated a trust necessarily arose in favor of Dante Lodge by construction of law which denies to defendant corporation the assertion of an absolute title in exclusion of the equitable estate in Dante Lodge, not only by reason of inadequate authorization by the membership of Dante Lodge for an absolute sale, but also by reason of a trust imposed upon the members of the committee inconsistent with their action in which they in effect undertook to sell the property to themselves.

"A reference will be made to a master for an accounting. Any debts or other obligations of Dante Lodge which may have been discharged by defendant will necessarily be allowed as credits. Rents collected and use of the property will be charged. When an equitable adjustment shall have been ascertained by the master a reconveyance will be ordered upon the discharge of the money, if any, that may be found due to defendant.

"In reviewing the facts reference should have been made to a paper produced by defendant and offered for identification by complainant and marked *Exhibit C25*. It purports to be a copy of a formal resolution for the sale of the property passed March 5th, 1927, and contains the signature, 'Luigi Faragulli, secretary.' That resolution does not appear in that formal manner upon the minutes of the lodge, and the secretary has testified that he only signed one resolution, to wit, a resolution of later date touching the withdrawal of building and loan association shares. The copy of the resolution on its face discredits itself. It contains the figures of $24,000 as the value placed on the real estate, whereas the appointment of the appraisal committee was not authorized until that date and the appraisal was not made until March 14th, 1927. See *Exhibit D1*."

After the filing of the master's report, certain exceptions were filed by the defendants. In overruling the exceptions the vice-chancellor delivered the following opinion:

"I think the master properly charged defendants with possession from March 15th, 1927, notwithstanding the fact that the final secession from the order did not occur until the following June. The property was conveyed on the former date, and defendants took over at that time all the assets of the old lodge at a valuation as of that date and collected the rents from that date and have claimed, and by the master been given allowances for, expenditures from that date, including janitor's charges.

"Nor am I able to sustain the exceptions which relate to the charge of $200 per month from that date as a reasonable charge for possession for those parts of the building, exclusive of the rented stores, with janitor service, heat and electricity supplied by the owner. The testimony is meagre touching the reasonable value of the space for which the charge is made; but it must be borne in mind that defendants were wrongdoers and had wrongfully taken title, and the value of their asserted right, as determined by the master, even if more than they did or could have realized, should not be now disturbed as an equitable charge against them

for their wrongful possession. Indeed, the damages which necessarily have been sustained by the Dante Lodge through defendants' misconduct can scarcely be adequately estimated and never be fully recompensed. I think the master's charge of $200 per month for possession, in addition to the amounts actually realized from the possession should stand.

"I am satisfied that no credit should be given defendant for the bonds of Dante Lodge which appear to have been delivered by defendants to the master. It may be that some small amount of cash has been paid by defendants for some of these bonds, but the testimony indicates to the contrary. Most of these bonds were surrendered by the individuals holding them and new bonds of defendant, Sons of Italy Association, were given the parties in lieu thereof. Some may have been surrendered without any competition, but as to that the testimony is not conclusive. But if not all, then nearly all, were exchanged in the manner stated. It is entirely obvious that such exchanges were made in the notion that Dante Lodge was, in effect at least, succeeded by the new organization, and it is impossible now to be certain that these persons making exchanges may not be entitled to assert a rescission of these exchanges. Whether Sons of Italy now are solvent does not appear; but in any event a full credit for the face value of these bonds cannot be equitably allowed at this time for several reasons. These bonds are not assignable to any but members, and it is well known that payment of such bonds are seldom enforced; the hope always being present and often realized that members will not enforce their payment. Some bonds of that issue had been voluntarily surrendered in whole or in part. The only equitable solution appears to be for Dante Lodge to place these surrendered bonds at the disposal of Sons of Italy to the end that they may be returned to the persons from whom they were received in exchange for the Sons of Italy bonds for which they were surrendered. This will restore the bonds where they should be. To credit Sons of Italy with their face value at this time would be clearly inequitable.

"The exceptions filed by Sons of Italy to the master's report will be overruled."

*Mr. Samuel P. Orlando* and *Mr. Harry Heher*, for the appellants.

*Mr. Albert S. Woodruff* and *Mr. Rocco Palese*, for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons given in the opinion of Vice-Chancellor Leaming.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, CAMPBELL, LLOYD, CASE, BODINE, DALY, DONGES, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, KERNEY, JJ.   15.

*For reversal*—None.